**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 3:23-CR-107 (OAW) |
| | : | |
| DARYL JONES. | : | |

**OMNIBUS RULING**

**THIS ACTION** is before the court upon the defendant's Motion to Dismiss the Indictment, ECF No. 170, and the government's motions in limine, ECF No. 167. The court has reviewed all the motions, the parties' responses and replies thereto, *see* ECF Nos. 176, 178, 181, and the record in this matter, and is fully apprised in the premises. For the reasons discussed herein, the Motion to Dismiss the Indictment is **DENIED,** and the government's motions in limine all are **GRANTED.**

## I.    BACKGROUND[1]

In June 2022, the Drug Enforcement Agency ("DEA") and the Federal Bureau of Investigation ("FBI") applied for wiretap authorization in connection with an investigation into a suspected drug trafficking organization ("DTO"). The wiretap authorization was granted by the Honorable United States District Judge Kari A. Dooley, and it was initially renewed and expanded twice (in August, and again in October, of 2022). Relevant here, the October 2022 authorization permitted law enforcement to monitor communications to and from a phone number belonging to Markos Pappas, the codefendant in this case. All

---

[1] The facts related herein are taken from the Motion to Dismiss the Indictment and the government's response thereto. The parties do not disagree as to these facts.

1

charges against Mr. Pappas were dismissed upon government motion "in the interest of judicial and prosecutorial economy given Mr. Pappas's . . . conviction in *United States v. Taylor, et al.*, 3:23-cr-62(OAW), which triggers substantially higher penalties and exposes Mr. Pappas to a substantially higher Guidelines range than the charges [previously] pending [against Mr. Pappas] in this matter."  ECF No. 134; *see also* ECF Nos. 135, 137. None of the affidavits upon which these initial three authorizations were predicated mentioned stolen vehicles, though the October 2022 affidavit did state that Mr. Pappas's two automotive garages were being used to manufacture and store drugs.

Between October 10, 2022, and November 4, 2022, law enforcement intercepted nine telephonic communications between Mr. Jones and Mr. Pappas.  The content of those conversations was not overtly criminal in nature.  The defendants simply discussed the purchase and sale of vehicles.

In November and December 2022, the three vehicles at issue in this matter were stolen in Georgia and transported to Connecticut.

Then, in January 2023, a fourth wiretap authorization was issued.  In addition to describing the continuing need for a wiretap in relation to the drug investigation, the affidavit supporting this fourth application also stated, "New Haven police recently located a stolen vehicle in an alleyway, where PAPPAS and [another individual] were also present. The vehicle had been reported stolen out of Georgia, and while there is not currently evidence to establish that PAPPAS knew the car was stolen, that matter is still under investigation."

On January 25, 2023, a progress report was sent to and signed by Judge Dooley.

2

Therein, Assistant United States Attorney Sarah P. Karwan stated that law enforcement had discovered that Mr. Pappas was planning to purchase likely stolen vehicles for resale. The government also represented that police had located a stolen vehicle from Pappas's brother, which Pappas said he had bought off Facebook marketplace.  Based on this information, Attorney Karwan instructed agents that calls about the interstate transport and possession of stolen vehicles were pertinent and could be monitored.

Coincidentally, the final intercepted conversation between the codefendants also occurred on this date.

Mr. Jones was not mentioned in any of the affidavits supporting any of the wiretap authorizations, nor was he identified in the January 2025 progress report.

The government presented the intercepted conversations and other testimony to a Grand Jury, and as a result, Mr. Pappas and Mr. Jones were indicted on charges of conspiracy to defraud the United States (Count One) and possession of stolen motor vehicles that had been in interstate commerce (Counts Two through Four).[2]

There were several joint or at least unopposed motions to continue jury selection in this matter while the drug charges against Mr. Pappas were pending in his other case. Mr. Pappas's drug case resolved after years of discovery and a lengthy jury trial, and then, as previously stated, his prosecution in this case no longer was pursued.  It was only then that Mr. Jones and the government realized that they did not agree on how this case against Mr. Jones ought to be resolved, which was attributed to either a change in prosecutors, a miscommunication between the parties, or some combination thereof.  *See*

---

[2] In a separate criminal action, Mr. Pappas also was indicted on charges related to his role in the DTO. *See United States v. Taylor, et al.*, Case No. 3:23-cr-62.

ECF No. 165 at 3.  Specifically, defense counsel had believed that the government was prioritizing the prosecution of Mr. Pappas in Case No. 3:23-cr-62, and that "following the resolution of that case, Mr. Jones's case could likely be resolved by a disposition favorable to Mr. Jones."  *Id.*  However, after Mr. Pappas was convicted in his drug case and his charges in the present matter were dismissed, "it became apparent that the case against Mr. Jones was not going to be resolved in a way that had been previously discussed."  *Id.*  Though the undersigned was not, is not, will not, and cannot be involved in the parties' negotiation to resolve this case short of trial, *see* Fed. R. Crim. P. 11(c)(1) (noting, "The court must not participate in these discussions [toward a plea agreement]."), the court certainly interpreted the parties' docket activity to suggest that the charges against Mr. Jones would be dropped, that he intended to be available to testify against Mr. Pappas at trial, or that the government was agreeing to recommend some sufficiently lenient agreed sentence upon his guilty plea.  **The undersigned would take that into account at sentencing[3] if Mr. Jones were to plead guilty or to be convicted after trial in this case, in the interest of justice.**  For the same reason, and absent government objection, the court permitted Mr. Jones to submit a dispositive motion although the deadline for such motions already had passed.  *See* ECF No. 174 (noting that it would be a "gross miscarriage of justice" to do otherwise).

Mr. Jones ultimately filed his Motion to Dismiss the Indictment.  Separately, the government timely filed motions in limine.  The court now reviews each in turn.

---

[3] Of course, though, the extent to which the court should take this into account could be argued by the parties in their sentencing briefs and at oral argument.

4

II.    **Motion to Dismiss the Indictment**

The Federal Rules of Criminal Procedure allow the parties to raise (before trial) "any defense, objection, or request that the court can determine without a trial on the merits."  Fed. R. Crim. P. 12(b)(1).  Mr. Jones asserts that the indictment should be dismissed because (1) the Grand Jury was presented with the intercepted conversations between him and Mr. Pappas, which should not have been intercepted since they were not pertinent to the DTO, and (2) the Grand Jury was presented with other misleading testimony.  The government responds that the conversations properly were intercepted, and that no material misrepresentations were presented to the Grand Jury.

A. **Intercepted Conversations**

The Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2515, et seq., establishes when law enforcement may monitor the private communications of individuals suspected of crimes.  In recognizing individuals' Fourth Amendment rights, it lays out stringent requirements for a wiretap.  Law enforcement must seek prior approval from a federal judge through an application and supporting affidavit which lists the target, the investigation, the need for such invasive investigative techniques, and affirmation that all other investigative means have been attempted.  *Id.* §§ 2516, 2518.  Even then, authorization lasts only thirty days, after which law enforcement must seek reauthorization if they wish to continue the wiretap.  *Id.* § 2518(5).

Congress considered the potential for "subterfuge searches," wherein law enforcement might use electronic monitoring to fish for evidence without probable cause, but also recognized the possibility of uncovering other crimes during lawful monitoring.

5

The Act therefore includes the following provision:

> When an investigative or law enforcement officer, while engaged in intercepting wire, oral, or electronic communications in the manner authorized herein, intercepts wire, oral, or electronic communications relating to offenses other than those specified in the order of authorization or approval, the contents thereof, . . . and any evidence derived therefrom may be [disclosed while giving testimony under oath in any proceeding held under the authority of the United States] when authorized or approved by a judge of competent jurisdiction where such judge finds on subsequent application that the contents were otherwise intercepted in accordance with the provisions of this chapter. Such application shall be made as soon as practicable.

18 U.S.C. § 2517(5).  Courts generally describe this provision as an extension of the "plain view" doctrine, whereby law enforcement need not ignore evidence of criminality discovered in the course of a lawful search, even if that evidence is unrelated to the object of the search.  Similarly, law enforcement need not ignore evidence of an unrelated crime they happen upon while lawfully monitoring a target's communications.  *United States v. Masciarelli*, 558 F.2d 1064, 1067 (2d Cir. 1977).

In contrast to the Act's requirements for initial applications and renewals thereof, there is no description of what constitutes a "subsequent application" for the purpose of § 2517(5).  In this circuit, though, "authorization under 18 U.S.C. § 2517(5) may be inferred when a judicial officer grants a continuation of the surveillance, even though the offense was not listed in the original order, so long as [the judge] was made aware of 'material facts constituting or clearly relating to [the] other offenses' in the application for the continuance."  *United States v. Ardito*, 782 F.2d 358, 362 (2d Cir. 1986) (quoting *Masciarelli*, 558 F.2d at 1067–68) (alteration in original).  Such authorization may even have retroactive effect.  *Masciarelli*, 558 F.2d at 1068) ("Congress intended that judicial

6

approval of the interception of evidence relating to unauthorized offenses might retroactively be granted pursuant to s 2517(5) upon a showing that 'the original order was lawfully obtained, that it [was] sought in good faith and not as a subterfuge search, and that the communication was in fact incidentally intercepted during the course of a lawfully executed order.'") (quoting S.Rep.No. 1097, 90th Cong., 2d Sess., reprinted in 1968 U.S. Code Cong. & Admin. News p. 2189) (alteration added).  In short, "[a]s long as the original order was sought in good faith and not as a 'subterfuge search,' § 2517(5) permits use in a subsequent prosecution of evidence of federal crimes that could not have formed the basis for an order ab initio under § 2516."  *United States v. Giordano*, 172 F. App'x 340, 342 (2d Cir. 2006).

Applying this authority to the facts presented here, the court finds no impropriety in the government's interception of communications between Mr. Pappas and Mr. Jones, nor in its presentation of those conversations to the Grand Jury.  While the initial wiretap authorization application did not conceive of the instant charges, it was sought for a proper purpose, and there is no indicia of bad faith in the government's interception or seizure of Mr. Pappas's communications with Mr. Jones.  While Mr. Jones argues the government should have disregarded those conversations as non-pertinent to the drug investigation, it is well-established that in monitoring communications, law enforcement is granted some flexibility to assess what they are hearing.  Six of the ten intercepted phone calls were less than two minutes in duration, which is generally considered "too brief a period for an eavesdropper even with experience to identify the caller and characterize the conversation . . . .'"  *United States v. Capra*, 501 F.2d 267, 275–76 (2d Cir. 1974) (quoting

*United States v. Bynum*, 485 F.2d 490, 500 (2d Cir. 1973), judgment vacated on other grounds, 417 U.S. 903 (1974)), and the longest one was "just under three and a half minutes long," ECF No. 178 at 12.   Furthermore, all of the conversations dealt with business transactions, which would not have been immediately apparent as inherently private or privileged, nor as non-pertinent to either a drug investigation or to some other criminal conspiracy, particularly where drug sales often are conducted in coded language, and where businesses (or "front companies") might be utilized to launder criminal proceeds or to otherwise facilitate unlawful activity.   Indeed, the Criminal Complaint as to Mr. Pappas mentioned that "the investigation has focused on money laundering of drug proceeds by PAPPAS through one of his purported legitimate businesses, Discount Auto & Cycle in New Haven."[4]   *See Taylor, et al.*, Case No. 3:23-cr-62, ECF No. 1-1 at 5 ¶ 8. Here in the present case, it was not unreasonable for law enforcement to have monitored a short call involving Pappas (a target of their judicially-approved wiretap) regarding motor vehicle dealings.   *See, e.g.,* the government's discussion of Judge Hall's reasoning in *United States v. Gonzalez*, 578 F. Supp. 3d 306 (D. Conn. Jan. 4, 2022), which itself cited to cases such as *Scott v. United States*, 436 U.S. 128 (1978).   The court finds this entire line of reasoning in the government's opposition brief to have been compelling and thus the court need not restate it here.   However, the court also highlights that it is presently examining a reasonable decision not to minimize short, intercepted conversations involving Mr. Pappas, which is clearly distinguishable from *further* law enforcement surveillance of *Mr. Jones* (the defendant in the instant case) beyond his communications

---

[4] The third authorization request from October of 2022 had linked two automotive garages to the DTO. *See* ECF No. 178 at 2–3.

with Mr. Pappas, and without separate judicial authorization for any such expanded wiretap surveillance.  Again, this case involves court-approved surveillance of a target who happened to be communicating with Mr. Jones.

Finally, whereas defense counsel argues that government suspicion of the crimes alleged in the present case were not included in the January 2023 affidavit seeking to extend the *Taylor / Pappas* wiretap, "despite the fact that the calls with Mr. Jones occurred in October and November 2022," *see* ECF No. 170 at 3, and thus that the Jones wiretaps should not have been presented to *his* grand jury, *id.*; *see also id.* at 8 (arguing that the government "intentionally misled the Grand Jury" by presenting "wiretap evidence that was illegally obtained against Mr. Jones"), the government counters that it provided timely updates to the court as its investigation developed and the context thereof was clarified, *see, e.g.,* ECF No. 178 at 2–5.  For example, defense counsel notes that the application for a fourth wiretap extension was filed on January 10, 2023 (after certain October and November 2022 calls between Mr. Pappas and Mr. Jones had been intercepted), and that the affidavit noted that a stolen vehicle had been recovered, but also conceded that there was not at such time evidence to establish that Mr. Pappas knew that it had been stolen. ECF No. 170 at 14.  The government, however, offers important context.  First, it notes that while the affidavit pertaining to the fourth extension conceded, "while there is not currently evidence to establish that PAPPAS knew the car was stolen," it went on to note (immediately thereafter, and within that **same sentence,** separated only by a comma), "that matter is still under investigation."  ECF No. 178 at 4.  Just fifteen days later, a progress report related to that extension updated the reviewing judge that the evidence

9

gathered to that point seemed to suggest that Mr. Pappas planned to buy stolen vehicles with cash and then quickly resell them in Connecticut, *id.* at 3–5, which developed into the crimes presently charged against Mr. Jones.  The government then went on to explain the significance of Mr. Pappas "contemplating the purchase of multiple, luxury, expensive cars, despite ongoing problems with his businesses," illustrated by key wiretap evidence in the *Taylor* trial summarized by the government as exposing a codefendant's commentary "that despite being a partner with Pappas in the tire shop, the only way Taylor made money with Pappas was when he sold drugs."  *Id.* at 9–10.  This made the calls between Pappas and Jones relevant to Mr. Pappas's "expenditure of large sums of money, which was reasonable for investigators to believe was drug proceeds."  *Id.* at 10.  Similarly, the law does not require investigators to be so gullible as to accept that Pappas was legitimately negotiating the cash purchase of several luxury vehicles for less than half their market value, and that he was making such purchases by way of gainful funds, particularly amidst the other evidence they had lawfully gathered.  *See id.* at 4–5.

And even though several months passed between the interception of the majority of the subject conversations and law enforcement's realization of their import, the affidavit supporting the final authorization and the January 2023 progress report both alerted Judge Dooley to the suspected transport of stolen vehicles, and her execution of the same is sufficient to grant retroactive authorization for the intercepted conversations.  *See United States v. Vario*, 943 F.2d 236, 243 (2d Cir. 1991) (finding the statute satisfied even where the government possessed intercepts for years before recognizing their relevance to criminal acts).

10

In summary, the court concludes that the government was permitted to use Mr. Jones's conversations in pursuit of the indictment, and Mr. Jones's first argument for dismissal fails.

### B. <u>Grand Jury Testimony</u>

Specific to the testimony the government presented to the Grand Jury in this case, Mr. Jones asserts that the government "knowingly and intentionally proffered misleading and false information . . . regarding the scope and nature of the conspiracy in securing an indictment against [him]."  ECF No. 170 at 23.  Moreover, because this "misleading and false information" was the only evidence presented on the instant charges, Mr. Jones contends that the indictment must be dismissed.

The Grand Jury serves "the invaluable function in our society of standing between the accuser and the accused, whether the latter be an individual, minority group, or other, to determine whether a charge is founded upon reason or dictated by an intimidating power or by malice and personal ill will."  *United States v. Mechanik*, 475 U.S. 66, 74 (1986) (O'CONNOR, J., concurring in judgment) (quoting *Wood v. Georgia*, 370 U.S. 375, 390 (1962)) (internal quotation marks omitted).  To that end, although prosecutors enjoy considerable leeway in the presentation of a case to the Grand Jury, *id.*, they are bound to follow Federal Rule of Criminal Procedure 6, and "courts must be ever vigilant to preserve the functions of the grand jury as an effective 'safeguard against oppressive actions of the prosecutor . . . .'" *United States v. Gallo*, 394 F. Supp. 310, 313–14 (D. Conn. 1975) (quoting *Gaither v. United States*, 134 U.S.App.D.C. 154, 413 F.2d 1061, 1066 (1969)).  The court's "supervisory power can be used to dismiss an indictment

11

because of misconduct before the grand jury . . . ." *United States v. Williams*, 504 U.S. 36, 46 (1992). Where, for example, "the government knows that perjured testimony has been given to the grand jury and that this testimony is material to the grand jury's deliberations, due process requires that the prosecutor take such steps as are necessary to correct any possible injustice." *United States v. Guillette*, 547 F.2d 743, 752–53 (2d Cir. 1976). Otherwise, though, "An indictment returned by a legally constituted and unbiased grand jury generally is not subject to attack on the ground that it is based on inadequate or incompetent evidence." *Id.* at 752.

There are three pieces of the evidence to which Mr. Jones specifically objects: (1) a special agent's testimony that the investigation into Mr. Jones's activities arose from "the wiretap portion" of "a larger investigation," and that Mr. Jones had been heard via the wiretap "discussing the auto theft portion of this investigation"; (2) testimony about Mr. Jones's October 2021 arrest and subsequent conviction for possessing a stolen vehicle; and (3) testimony that Mr. Pappas lied to officers when he was found with a stolen vehicle. With respect to the first item of evidence, Mr. Jones asserts that the cited testimony indicated to the Grand Jury that Mr. Jones was connected to the DTO, which in turn connected Mr. Jones to gang activity, although there is no evidence he is affiliated with the DTO or any gang. With respect to the second item of evidence, Mr. Jones contends the government failed to provide necessary context which might have weakened the import of the testimony. And as to the last piece of evidence, Mr. Jones asserts that the testimony presented to the Grand Jury directly contradicted the information in the affidavit supporting the January 2023 wiretap reauthorization application.

12

Taking the last argument first, the Grand Jury testimony occurred six months after the affidavit was submitted, and so it is not at all surprising that the continuing investigation would yield more evidence than was provided in the affidavit, or that law enforcement might develop different conclusions based on that additional evidence. Therefore, the Grand Jury testimony patently does not qualify as even misleading testimony, much less perjury, simply because it differed from the affidavit. That argument therefore is rejected.

Turning to the October 2021 arrest, Mr. Jones argues that the government misled the Grand Jury by alleging the date of the arrest was the start date for the conspiracy charged in Count One even though Mr. Jones told the arresting officers that he was driving the vehicle on behalf of someone other than Mr. Pappas. But in the first instance, the indictment returned by the Grand Jury found probable cause to believe that Mr. Jones had conspired with Mr. Pappas *and others known and unknown* to the Grand Jury to transport stolen cars over state lines. ECF No. 1 at 1. Thus, even if Mr. Jones was driving that car at the behest of some third party, that still would be entirely consistent with the conspiracy charge. Moreover, the court has not found, and Mr. Jones has not provided, any authority to support the proposition that the government was obligated to present this additional context to the Grand Jury. Indeed, the government has no obligation to present even exculpatory evidence to a Grand Jury. *United States v. Bove*, 888 F.3d 606, 611 (2d Cir. 2018). The court therefore concludes that Mr. Jones's statements at the time of his arrest were, at best, "inadequate or incompetent evidence" that generally cannot form the basis of a challenge to an indictment. Therefore, this argument also fails.

13

Finally, the court takes up the special agent's Grand Jury testimony.  First, the court finds that it was simply accurate to characterize the investigation into the suspected conspiracy between Mr. Jones and Mr. Pappas as arising from, or as part of, the larger investigation into the DTO.  It is unclear how else the agent could have, or should have, described the investigation into the car thefts.  And while the special agent did refer to the DTO investigation in describing how the instant charges arose, he did not otherwise connect the two conspiracies.  His reference to "other gang members" was singular, and was made only when describing the larger investigation out of which the narrower investigation into car thefts arose.  The court finds this early, offhand comment insufficient to improperly prejudice the Grand Jury against Mr. Jones.  Finally, because Mr. Pappas was implicated in both investigations and both conspiracies, the Grand Jury would have been aware of the DTO and of its relationship to gang activities, anyway.  Thus, the court finds that the agent's testimony was not misleading, and that it could not reasonably have incited any improper prejudice in the Grand Jury which might warrant dismissal of the indictment.  As such, this argument is rejected.

Accordingly, Mr. Jones's Motion to Dismiss the Indictment is denied.

### C. Motions in Limine

The government moves (1) to be allowed to make an opening statement, (2) to exempt the case agent, Ryan Halpin, from any sequestration order, (3) to admit certain other bad acts of Mr. Jones, (4) to admit wiretap recordings and transcripts, and (5) to admit co-conspirator statements.  The defense does not object to Agent Halpin's presence during other witnesses' testimony at trial, and so that motion is granted.  And

14

his objection to admission of the recorded calls raises the same arguments proffered in his motion to dismiss the indictment, which arguments have been rejected *supra*. Accordingly, that motion also is granted over his objection.

The court addresses the remaining motions seriatim.[5]

### i. *Legal Standard*

It is well-settled that federal district courts have inherent authority to manage trials. *Luce v. United States*, 469 U.S. 38, 41 (1984). Hence, they consider motions in limine "to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996). A ruling on a motion in limine is subject to change during trial, particularly if the evidence differs from the original proffer. *Luce*, 469 U.S. at 41–42. "Indeed even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous in limine ruling." *Id*. "Evidence should be excluded on a motion in limine only when the evidence is clearly inadmissible on all potential grounds." *Byrne v. Yale Univ., Inc.*, No. 3:17-CV-1104 (VLB), 2020 WL 5258998, at *2 (D. Conn. Sept. 3, 2020).

### ii. *Opening Statements*

Mr. Jones objects to permitting opening statements given that this trial is expected to last just a few days. Local Criminal Rule 57.2 gives courts the discretion to allow or deny opening statements in a criminal trial. As the evidence in this case is likely to be relatively minimal, and the alleged conspiracy is not complex, the objection is sustained.

---

[5] Mr. Jones asked for a hearing on these issues, but the court finds that the parties' briefs fully present their arguments such that a hearing is not necessary. Therefore, the court now rules on the papers.

Denial of this motion can be considered by the parties in proposing their joint description of this case, which the court will deliver to the jurors.  *See* ECF No. 174.  The court is confident in the ability of the jurors to discern facts such as how legitimate car sales occur.

### iii.  *Bad Acts*

The government intends to introduce evidence of Mr. Jones's October 2021 stop by law enforcement and his related guilty plea and conviction for misdemeanor theft related to "a stolen white 2019 Jeep Wrangler Rubicon with an altered VIN on its dashboard and driver's side doorjamb in Madison, Georgia."  ECF No. 1 at 4 ¶ 13(a). Because the stop occurred during the alleged conspiracy, the government contends it is intrinsic to the charged crime.  In the alternative, the government argues that it is evidence of Mr. Jones's knowledge of the manner and means of the charged conspiracy and of the absence of any mistake or accident.  Mr. Jones contends that this evidence is unrelated to the charged conspiracy, since Mr. Jones purportedly was driving the vehicle on behalf of someone other than Mr. Pappas, and moreover, that it is unduly prejudicial.

The indictment alleges that on October 28, 2021, Mr. Jones possessed a stolen vehicle in furtherance of the charged conspiracy.  *Id.*  Mr. Jones again argues that the testimony presented to the Grand Jury improperly identified Mr. Jones's possession of a stolen vehicle on this day as related to the charged conspiracy, which the court already has rejected in relation to the Motion to Dismiss the Indictment, and for the same reasons, this argument again is rejected.

Given that conclusion, whether Mr. Jones possessed a stolen vehicle on that day, and if so, whether that was an act in furtherance of the charged conspiracy, are questions

16

of fact for a jury to decide.  However, possession of this stolen Jeep Wrangler Rubicon is one of the "overt acts" Mr. Jones is alleged to have committed in furtherance of the conspiracy charged at Count One, but it *is not* one of the stolen motor vehicles Mr. Jones is ***charged with possessing*** at Counts Two through Four in this case.  *See* ECF No. 1. Therefore, while admission of this evidence would be highly probative of Mr. Jones's **knowledge,** it would unnecessarily invite a host of side issues which might risk the fairness of Defendant's trial.  For example, if the defendant entered a straight guilty plea in that prior case involving the Jeep, that plea essentially would amount to a confession, which is admissible evidence of a crime, absent evidence it was improperly obtained (which Mr. Jones does not assert).  However, Mr. Jones might well wish to explain to the jury the many reasons why someone might plead guilty to a misdemeanor, which is a debate the jurors need not assess in this case, particularly when there appears to be ample other available evidence from Mr. Jones's own intercepted communications which reasonably could support convictions regarding possession of the stolen motor vehicles actually charged in the present case.  And while the court does not exclude this evidence simply because the government might not need it to secure convictions at trial, such exclusion would avoid true risks of juror confusion in crafting an instruction that the government need not prove all alleged overt acts, together with an effective instruction on propensity evidence and/or an appropriate limiting instruction which, combined, might fit this particular set of facts without risking undue prejudice to the defendant and unnecessary waste of time as to the jurors in this otherwise short and simple trial.  This is of particular concern considering potential arguments as to minor dissimilarities such

17

as between the charged vehicles (all Ford vehicles, two of which were F-150 Raptors) and the Jeep, the removal or existence of certain identifying features, and the timing of the allegations related to each of those vehicles, all in combination with the fact that the prior conviction relates to a misdemeanor, as previously discussed.

For these reasons, the court denies the motion to admit facts related to Mr. Jones's motor vehicle stop from October 28, 2021 (and the conviction corresponding thereto), and finds that such mention is inadmissible at trial in that its risk of unfair prejudice, confusion, and waste of time substantially outweighs its probative value under Rule 403 of the Federal Rules of Evidence. However, the recordings and transcripts of Mr. Jones's intercepted communications are deemed admissible, and they might well be even more supportive of reasonable guilty verdicts than might the misdemeanor conviction that the government sought to admit. As always, though, the court invites the parties to timely present any **stipulations** they would like to offer, along with how and when they would ask that they be presented to the jury.

### iv. *Co-Conspirator Statements*

Finally, the government seeks to admit statements made by Mr. Pappas, Mr. Jones's alleged co-conspirator. Under Federal Rule of Evidence 801(d)(2)(E), a co-conspirator's statement is admissible provided the court finds "by a preponderance of the evidence '(a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy.'" *United States v. James*, 712 F.3d 79, 105 (2d Cir. 2013) (quoting *United States v. Farhane*, 634 F.3d 127, 161 (2d

18

Cir.2011)).  Mr. Jones asserts that the government cannot satisfy this standard because there is insufficient evidence to show that a conspiracy existed in the first place.

The court disagrees.  Mr. Jones contends that the wiretap intercepts show only that he sold vehicles to Mr. Pappas, as was his business, and that if Mr. Pappas happened to be found with stolen vehicles which were similar to those Mr. Jones sold him, that does not show that Mr. Jones sold him the stolen cars.  Mr. Jones is free to make this argument at trial, but for the purpose of this motion in limine, the court finds that the intercepted telephone conversations about the sale of certain vehicles by Mr. Jones to Mr. Pappas, apparently at an extremely low price, is sufficient to show that a conspiracy existed between them, particularly where Mr. Pappas was later found possessing stolen vehicles which match the description of those discussed with Mr. Jones, and where there is no other apparent evidence as to the existence of any other vehicles which match those same descriptions and which were legitimately sold to Mr. Pappas (and/or by Mr. Jones).

Thus, Mr. Jones's objection is unavailing, and this government motion is granted.

### III.    <u>CONCLUSION</u>

For the foregoing reasons, it hereby is **ORDERED and ADJUDGED** as follows:

1. Defendant's Motion to Dismiss the Indictment, ECF No. 170, is **<u>DENIED.</u>**

2. The government's motions in limine, ECF No. 167, are **<u>GRANTED in part,</u>** but **<u>DENIED in part</u>**:

    a. Opening statements will not be permitted;

    b. Agent Halpin shall be exempted from any order of sequestration;

   c. The motor vehicle stop from October 28, 2021, and related misdemeanor conviction are inadmissible; and

   d. The intercepted communications (including recordings and transcripts thereof) of Mr. Jones and of Mr. Pappas are admissible.

3. The parties' motions to seal, ECF Nos. 171 and 180, are **GRANTED.** Pursuant to Local Rule of Criminal Procedure 57(b)(3)(A), the court finds that good cause exists to seal the exhibits filed at ECF Nos. 172 and 179.   Specifically, the court finds that the documents contain presumptively confidential investigatory and Grand Jury evidence.  Further, the court finds that currently there is no ascertainable date by which the documents may be unsealed.  Therefore, docket entries 172 and 179 shall remain under seal until further order of the court.

4. Given the developments in this case, the parties hereby are re-referred to United States Magistrate Judge Robert A. Richardson for a final hearing pursuant to *Missouri v. Frye*, 566 U.S. 134 (2012).  *See* ECF Nos. 153, 165.


**IT IS SO ORDERED** at Hartford, Connecticut, this 7th day of May, 2026.


                        */s/*
                        OMAR A. WILLIAMS
                        UNITED STATES DISTRICT JUDGE